## In re BENSON.

(Circuit Court, S. D. New York. July 28, 1904.)

1. CRIMINAL LAW—REMOVAL OF PRISONER TO ANOTHER DISTRICT—SUFFICIENCY OF INDICTMENT.

   Technical or formal objections to the sufficiency of an indictment will not be considered in proceedings for the removal of a federal prisoner to the district in which he is triable, but will be left for determination by the court in which it was found; but if, on a broad and liberal construction, the indictment does not appear to charge an offense, the prisoner should not be held for removal.

2. SAME.

   An indictment for conspiracy under Rev. St. § 5440 [U. S. Comp. St. 1901, p. 3676], charged that petitioner conspired with others to obtain by means of fictitious applications and other false and fraudulent practices from the states of California and Oregon the title to large amounts of school lands owned by said several states, and lying within the boundaries of United States forest reservations, and then to exchange such lands, under the federal statutes providing therefor, for public lands of the United States subject to homestead entry outside of such reservations. *Held*, that while such acts would constitute a conspiracy to defraud the states, the indictment did not charge a "conspiracy to commit any offense against the United States, or to defraud the United States in any manner," within the meaning of the statute, since it appeared from its averments that the United States would obtain title to the school lands by the exchanges contemplated; and that such indictment would not sustain proceedings for the removal of petitioner to the district of the indictment for trial.

In the Matter of the Application of John A. Benson for Writs of Habeas Corpus and Certiorari.

The petitioner was indicted in the District of Columbia, and, not being found there, was arrested in the Southern District of New York upon a warrant of United States commissioner, based upon a certified copy of the indictment. Some testimony was introduced before the commissioner, the certified copy of the indictment was before him, identity was not disputed, and he committed the petitioner to the custody of the marshal to await the issuance of a warrant of removal by the district judge under section 1014, Rev. St. U. S. [U. S. Comp. St. 1901, p. 716].

Frank H. Platt, for petitioner.

Henry L. Burnett, U. S. Atty., and E. E. Baldwin, Asst. U. S. Atty.

LACOMBE, Circuit Judge. This court has recently held in another removal proceeding under a different indictment against this same petitioner that the insufficiency of the indictment will not be

¶ 1. See Criminal Law, vol. 14, Cent. Dig. § 509.

inquired into in such a proceeding (130 Fed. 486), but is a question to be decided by the court in which the indictment is found. All technical objections, all criticisms growing out of the artificial and often strained scrupulousness of criminal procedure are to be left to the court in whose jurisdiction the indictment is found, if such indictment itself contains a narration of events or acts which tend to establish the existence of the offense sought to be charged. Where, however, even upon a broad, liberal, and inartificial construction of the language of the indictment, it does not appear that any offense against the laws of the United States has been committed, the section (1014, Rev. St. [U. S. Comp. St. 1901, p. 716]) does not apply, and the prisoner should not be held for removal.

The crime with which the indictment purports to charge the petitioner is defined in section 5440, Rev. St. U. S. [U. S. Comp. St. 1901, p. 3676]:

"5440. If two or more persons conspire either to commit any offense against the United States or to defraud the United States in any manner or for any purpose, and one or more of such parties do any act to effect the object of the conspiracy all the parties to such conspiracy shall be liable to a penalty of not more than ten thousand dollars, or to imprisonment for not more than two years, or to both fine and imprisonment in the discretion of the court."

There are 30 counts in the indictment, each concerned with a separate transaction. It will be necessary to consider a single count only, since all are substantially alike. The pleader has followed the archaic forms of expression commonly used in criminal practice— obscure, involved, tautological, and verbose. A single sentence runs stumbling over several printed pages without a period. The meaning can be discovered only by carefully rewriting the sentence actually or mentally, so as to conform it to the canons of modern English. When this is done, it will be found that the facts upon which the charge of conspiracy is based are these: Heretofore the United States, being at the time the owner thereof, conveyed to the states of California and Oregon, respectively, certain sections of public land; the sections so conveyed to these states being known as school lands. These school lands, or at least some portion of them, the two states sold, granted, and conveyed to individual holders. Subsequently the United States decided to establish forest reserves in certain localities in those states (and elsewhere), and under authority of statute maps were filed designating the boundaries of such reserves. Within those boundaries it would happen that, besides land still belonging to the United States, there would be included school lands which had been transferred to the states, and which were still held by them, and also school lands which the said states had conveyed to private owners by patents duly executed, and also school lands as to which steps had been taken to secure patents from the states. Inasmuch as it was desirable that all lands within forest reserves should be under the absolute control of the government, the statutes further provided that United States public lands located outside the limits of the reserves might be exchanged for lands within the same, with assent of the owner. Presumably since the possibility of an increase in value would be greater outside than in, the owners gen-

erally might be expected to accept the offer. The sections providing for such exchange are these:

In Act June 4, 1897, c. 2, 30 Stat. 34, 36 [U. S. Comp. St. 1901, p. 1538], supplemental to Act March 3, 1891, c. 561, § 24, 26 Stat. 1103 [U. S. Comp. St. 1901, p. 1537]:

"That in cases in which a tract covered by an unperfected bona fide claim or by a patent is included within the limits of a public forest reservation, the settler or owner thereof may, if he desires to do so, relinquish the tract to the government, and may select in lieu thereof a tract of vacant land open to settlement not exceeding in area the tract covered by his claim or patent; and no charge shall be made in such cases for making the entry of record or issuing the patent to cover the tract selected: provided further, that in cases of unperfected claims the requirements of the law respecting settlement, residence, improvements, and so forth, are complied with on the new claims, credit being allowed for the time spent on the relinquished claims."

In Act June 6, 1900, c. 791, 31 Stat. 614:

"That all selections of land made in lieu of a tract covered by an unperfected bona fide claim, or by a patent, included within a public forest reservation, as provided in the act of June fourth, eighteen hundred and ninety-seven, * * * shall be confined to vacant surveyed and non-mineral public lands which are subject to homestead entry not exceeding in area the tract covered by such claim or patent: provided, that nothing herein contained shall be construed to affect the rights of those who, previous to October first, nineteen hundred, shall have delivered to the United States deeds for lands within forest reservations and make application for specific tracts of lands in lieu thereof."

This provision was re-enacted March 3, 1901, 31 Stat. 1037, c. 831 [U. S. Comp. St. 1901, p. 1544].

For reasons of public policy, which may be readily appreciated, these two states offered their school lands for sale with certain statutory restrictions. Sales were to be made only to citizens of the United States or to persons who had declared intention to become citizens, and only upon affidavit of the applicant showing his qualifications, and, amongst other things, his intention to purchase such lands in good faith, and for his own benefit, and that he had made no contract or agreement to sell the same. Moreover, the amount of such lands which should be sold by the state to each resident applying therefor was restricted to 640 acres in California and 320 acres in Oregon. Once the sale was made, however, to a bona fide applicant, and title in him perfected by the delivery of a patent for the same, the lands so sold became his to dispose of as he pleased, and there is nothing called to the attention of this court in the legislation of those states which prohibits a purchaser from buying such lands from any resident patentees who might subsequently decide to sell, even although by such purchases he might become the sole owner of thousands of acres of such school lands.

The particular "false and fraudulent practice" which is charged as the gravamen of the conspiracy is this: Applications for purchase were to be made and filed in the names of fictitious persons, and in the names of persons not really desiring and not qualified to purchase the same, and of persons who had already assigned to the conspirators; and these applications were in many instances to be supported by false, fraudulent, or fictitious affidavits. The details need not be more particularly rehearsed. Suffice it to say that the

school lands thus obtained by fraudulent practices from the two states were to be exchanged, under the statutes above quoted, for public lands of the United States lying outside the forest reserves; the said conspirators, in the language of the indictment, "intending thereby and by afterwards selling and disposing of such public lands and patent titles to the general public to defraud the said United States out of the possession and use of, and of the title to, the public lands so to be selected, obtained and appropriated in lieu of such school lands as aforesaid to the profit, gain, use and benefit of themselves." Manifestly, the entering into such a scheme would be a conspiracy to defraud the states of California and Oregon, but it is difficult to understand upon what theory it can be held to be a "conspiracy to commit any offense against the United States or to defraud the United States in any manner." There is nothing to show that the alleged conspirators ever contemplated offering to the United States Land Office in exchange for "outside" lands of the United States any "school" lands for which the state had not granted a patent to the applicant. When patented school lands are taken by the United States in exchange for other lands which constitute a valuable consideration, the government acquires a perfect title to such school lands. Authorities need not be cited, since it was conceded on the argument and on the brief that the title obtained by a patentee cannot be attacked collaterally for frauds practiced in obtaining it. The United States, therefore, assuming that the alleged conspiracy were consummated, would have obtained from the state patentee of school lands a perfect title acre for acre in exchange for its own "vacant surveyed and nonmineral public lands which are subject to homestead entry." With the methods by which the patentee acquired his title from the state it had no concern. If state laws were violated, and the public policy of the state fraudulently evaded, it may be assumed that the state would punish the offender. The language of the federal statute apparently contemplates some inquiry as to whether the requirements of state law respecting settlement, residence, improvements, and so forth have been complied with in cases of "unperfected claims"; but none such is provided for when the tract offered in exchange is covered by a patent. The reason for the distinction is obvious. All that the United States wanted was a good title. Where a claim was unperfected, it would be necessary to ascertain what had been done to make it fruitful; where a patent had issued all such inquiry would be unnecessary. The conspiracy charged, as was said before, did not contemplate the offering in exchange for outside lands of any school lands except such as are covered by patent.

It is true that the result of the conspiracy would be that a single small group of individuals might become possessed by exchange of large holdings of outside lands, which might otherwise have been more widely distributed; but that would not be a fraud on the United States, because under the laws, state and national, as they stand, it would be possible for a single individual, acting in entire good faith, to acquire by purchase from honest, bona fide state patentees the title to all the school lands in the state, and, by exchanging them

under the provisions of statute above quoted, to become the sole owner of an equal quantity of "outside" lands.

Upon the broadest construction which can be given to the indictment it does not set forth facts tending to show a conspiracy to commit any offense against or to defraud the United States, and the petitioner should therefore be discharged. Should the District Attorney desire to appeal, the petitioner will be required during its pendency to give bail in the amount fixed when this proceeding was instituted.